IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

FILED
AUG 0 8 2014
United States Magistrate Judge

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE USE
OF A PEN REGISTER DEVICE AND TRAP
AND TRACE DEVICE FOR TELEPHONE
NUMBER 281-905-1739

No. 14-PR-2034 DPR

(UNDER SEAL)

## APPLICATION

Gary Milligan, Assistant United States Attorney, Western District of Missouri, (hereinafter "Applicant") hereby applies to the Court pursuant to 18 U.S.C. §§ 3122, 3123 and 2703(d) for an order authorizing the installation and use of a pen register, a trap and trace device and enhanced caller identification (hereinafter "Pen/Trap") on telephone bearing number 281-905-1739 (hereinafter the "Target Telephone"), including the authorization for the disclosure of subscriber information for the numbers captured by the Pen/Trap. In support of this application, I state the following:

1.    Applicant is an "attorney for the Government," as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and therefore, pursuant to 18 U.S.C. §§ 3122 and 2703(d), may apply for an order authorizing the installation and use of a Pen/Trap.

2.    By this application, the Government seeks an order authorizing (A) the installation and use of a Pen/Trap on the Target Telephone and (B) the acquisition of subscriber information related to the use of the Target Telephone.

## (A)  PEN REGISTER / TRAP AND TRACE

3.      Pursuant to 18 U.S.C. § 3123(a)(1), upon an application made under 18 U.S.C. §3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing investigation."

4.      Installation and use of a pen register will record or decode dialing, routing, addressing, or signaling information transmitted from the Target Telephone.  The information transmitted from the Target Telephone will include information dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-talk capable and will include dialing, routing, addressing, or signaling information for text messaging communications if the cellular device is text messaging capable.  The information will also include records regarding the date, time and duration of calls created by such incoming impulses, for a period of sixty days.

5.      Installation and use of a trap and trace device on the Target Telephone will capture and record the incoming electronic or other impulses which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the sources of wire or electronic communications.  The information transmitted from the Target Telephone will include information dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-talk capable and will include dialing, routing, addressing, or signaling information for text messaging communications if the

2

cellular device is text messaging capable. The information will also include records regarding the date, time and duration of calls created by such incoming impulses, for a period of sixty days.

6.    A caller identification service is a trap and trace device under 18 U.S.C. § 3127(4); *See United States v. Fregoso*, 60 F.3d 1314, 1320 (8th Cir. 1995). Thus, this order will also direct that Sprint Corporation examine the above-listed telephone number and add enhanced caller identification service to the existing service if it is not presently equipped with the feature.

## (B)  SUBSCRIBER INFORMATION

7.    Pursuant to 18 U.S.C. § 2703(d), a court may order an electronic communication service to disclose non-content information about a customer or subscriber if the Government "offers specific and articulable facts showing that there are reasonable grounds to believe that the .... records or other information sought are .... relevant and material to an ongoing criminal investigation."

8.    Applicant certifies the Drug Enforcement Administration is conducting a criminal investigation of Nelson Olmeda, and others as yet unknown, in connection with possible violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, distribution, possession with the intent to distribute, and conspiracy to distribute controlled substances. It is believed one or more of the subjects of the investigation are using the Target Telephone, a mobile cellular device issued by Sprint Corporation, used by Nelson Olmeda in furtherance of the subject offenses.

9.    In support of its request for an order under 18 U.S.C. § 2703(d) directing the furnishing of subscriber information, and based upon discussions with DEA Task Force Officer (TFO) Daniel P. Banasik, Applicant sets forth the following specific and articulable facts showing

there are reasonable grounds to believe the information sought is relevant and material to an ongoing criminal investigation:

a.  On March 22, 2014, the Missouri State Highway Patrol received information from the Lawrence County Sheriff's Office of an armed robbery occurring near Halltown, Missouri. The alleged victim, Melody W. Carpenter, of Springfield, Missouri, indicated the suspects left in a white Chevrolet Tahoe. Missouri State Highway Patrol Officers, Corporal Roger A. Meyers and Corporal Steven A. Donnell, located the vehicle, a white 1999 Chevrolet Tahoe, bearing Missouri registration DK2-A2Z, on I-44 at US 160. After the vehicle refused to stop, the Highway Patrol Officers initiated a pursuit. Missouri State Highway Patrolman Trooper Thomas J. Stevens joined in the pursuit. The pursuit ended in a yard in the 1800 block of Farm Road 101, Willard, Missouri. Both occupants fled but were immediately apprehended. The driver and registered owner of the vehicle was identified as Rodrick E. Herbert, and the passenger of the vehicle was identified as Kelly M. Green, also known as Kelly M. Prochaska. Missouri Department of Revenue indicated the aforementioned license is registered to Rodrick Herbert, TOD (Transfer of Death) to Kelly Green on a 1999 Chevrolet Tahoe.

b.  Located underneath the driver's seat were two cellophane and duct tape wrapped bundles of suspected cocaine joined together by duct tape. A roll of duct tape was located in a driver's door compartment and discarded packaging, similar to that used to transport a kilogram brick of cocaine, was located on the passenger backseat floorboard. Drug paraphernalia, several cellular telephones, and personal clothing were also located throughout the vehicle.

4

c.      On March 22, 2014, Kelly M. Green was interviewed by law enforcement at Cox South Hospital in Springfield, Missouri. It was later determined she was not being totally honest during this interview. On March 23, 2014, Kelly M. Green was again interviewed. Before initiating the second interview, Green was read her Constitutional *Miranda* rights, and Green indicated that she understood her rights and waived them.

d.      Green admitted not being totally truthful in her first interview. Green then stated that Herbert (the driver of the vehicle she was riding in on March 22, 2014) knew he was wanted and planned to turn himself into law enforcement, but wished to see his relatives before doing so. On Monday, March 17, 2014, Herbert and Green left for Galveston, Texas so Herbert allegedly could visit his mother and grandmother. After leaving Galveston, Texas, Herbert told Green he wished to visit a friend in Rosenberg, Texas. Herbert identified the friend only as "Diego."

e.      Green stated they met "Diego" at the Plantation Inn on or about Thursday, March 20, 2014, and left Friday, March 21, 2014. When they arrived at the Plantation Inn, a white female, later identified as Melody W. Carpenter, was with "Diego." Green stated she was told Carpenter had been stranded in Rosenberg, Texas, and needed a ride back to Springfield, Missouri. Herbert agreed to give Carpenter a ride. Green stated she had never met Carpenter or "Diego" before. After leaving Rosenberg, Texas, Green stated it became apparent they were transporting cocaine back to Springfield, Missouri, because Herbert, utilizing his telephone, began negotiating with a subject in Springfield and Carpenter about the price of a kilogram of cocaine. Green also stated while staying at a motel in Oklahoma she observed the kilogram of cocaine.

5

f.      Carpenter was also interviewed and, although her account differed somewhat from Green's account, she also admitted to the presence of cocaine in the vehicle. Carpenter stated she had driven to the Houston, Texas area with a person named Robert Snow and an individual known only to Carpenter as "Diego" on or around March 17, 2014. Carpenter stated "Diego" was a known methamphetamine and marijuana transporter and distributor living in the Springfield, Missouri and Houston, Texas areas. According to Carpenter, they stayed in a hotel in Rosenberg, Texas. On or around Thursday, March 20, 2014, Kelly Green and Rodrick Herbert arrived.

g.      Carpenter stated it appeared to her that Green had arranged a kilogram cocaine transaction between Herbert and "Diego."      On Friday, March 21, 2014, Herbert, Green, and Carpenter left Rosenberg, Texas heading to Springfield, Missouri. "Diego" arranged for Carpenter to ride back to Springfield with Herbert and Green to safeguard the cocaine. However, prior to arriving in Springfield and prior to the stop by the Missouri State Highway Patrol, Carpenter was left near Halltown, Missouri.

h.      On April 8, 2014, Carpenter (now a Missouri State Highway Patrol Informant), informed TFO Banasik she had been contacted by "Diego." "Diego" informed Carpenter he was anticipating transporting six "birds" (a code word for kilogram) of methamphetamine to Springfield, Missouri from Houston, Texas or Atlanta, Georgia. "Diego" would place the methamphetamine in a load vehicle and follow the load vehicle to Springfield, Missouri.

i.     Once in Springfield, "Diego" intended to distribute the methamphetamine. Carpenter indicated "Diego" has a brother living in Springfield, Missouri and intended on staying with him.

j.     On April 9, 2014, Carpenter placed a recorded telephone call to "Diego," via the Target Telephone (281-905-1739). During the ensuing conversation, "Diego" indicated the methamphetamine was stuck in Mississippi and he was unsure when it would be delivered. "Diego" also indicated he might only be receiving two kilograms of methamphetamine and tentatively agreed to sell Carpenter one of them.

k.     On April 10, 2014, several recorded telephone conversations were placed/received to and from "Diego," via the Target Telephone (281-905-1739). During those conversations, with the approval of law enforcement, it was arranged for Carpenter to wire transfer three hundred fifty dollars ($350.00) to "Diego" in order for "Diego" and other unknown associates to rent a vehicle and travel to Mississippi to retrieve approximately four pounds of methamphetamine and bring it to Springfield, Missouri. "Diego" indicated that he would follow the "load vehicle" containing the methamphetamine. At the direction of law enforcement and utilizing law enforcement funds, Carpenter placed three hundred and fifty dollars on a credit card device and the transfer number was given to "Diego." At approximately 5:08 p.m., "Diego" contacted Carpenter and informed Carpenter they had left Houston, Texas.

l.     On April 11, 2014, at approximately 1500 hours, Carpenter informed officers that "Diego" had advised that he was currently in Branson, Missouri traveling

towards Springfield, Missouri. Officers were then deployed on U.S. 65, the highway from Branson to Springfield, in an attempt to locate and identify "Diego."

m.      On April 11, 2014, a 2014 maroon Dodge Dart, bearing Texas registration CWW8205, was stopped by Missouri State Highway Patrolmen Sergeant Mark Trader and Trooper Rob Wilkins on U. S. 65 at the U.S. 60 interchange. Texas Department of Revenue indicated the aforementioned registration was currently not in their system, but paperwork presented to the Troopers revealed it to be an Enterprise rental vehicle. There were four occupants in the vehicle: Sergio Contreras Jr, driver and renter of the vehicle, identified through a Texas Driver's License; Senon Guzman Jr, identified through a Texas Driver's License; Roberto Jaramillo Guevara, identified through a Texas Driver's License; and Nelson Olmeda, no identification.

n.      The court authorized GPS Locator activated on the Target Telephone (281-905-1739) indicated it was near the stop location. Furthermore, "Diego" contacted Carpenter during the traffic stop and informed Carpenter his vehicle had been stopped, via the Target Telephone. Carpenter was shown a picture of Olmeda and she stated Olmeda was the individual she knew as "Diego." Carpenter also identified a picture of Sergio Contreras as "Gordo," Olmeda's boss. Carpenter stated she had met Contreras in Rosenberg, Texas during the aforementioned kilogram of cocaine transaction. Attempts to locate the second vehicle containing the methamphetamine were unsuccessful.

o.      After the identification of "Diego" attempts were made with Carpenter to assist in locating "Diego" a/k/a Olmeda and the methamphetamine, as well as for her to facilitate a methamphetamine transaction. It became apparent Carpenter did not want to

8

continue her assistance with law enforcement because she stopped responding to calls from law enforcement and stopped making contact with law enforcement.

p.      On April 15, 2014, under the direction of the Drug Enforcement Administration, a confidential source whose information has previously proven reliable (hereinafter referred to as "CS") arranged, via several calls over telephone number 417-300-3660, to purchase one ounce of methamphetamine from Carpenter later in the evening. At approximately 10:24 p.m., Carpenter and Olmeda arrived at the predetermined location. Carpenter got out of her vehicle and subsequently sold the CS one ounce of methamphetamine. The transaction was observed and recorded by law enforcement. During the transaction, Carpenter told the CS about the aforementioned vehicle enforcement stop, how she is assisting the aforementioned individuals from Texas in eluding law enforcement, and hiding the methamphetamine. Carpenter also told the CS her vehicle is known to law enforcement and doesn't want to conduct business utilizing her vehicle. Carpenter then asked the CS to rent her a vehicle so she could use to in order to conduct business.

q.      On April 25, 2014, the DEA sought and obtained a pen register/trap and trace order for telephone number 417-300-3660. The pen register initially provided useful information including confirmation of contacts between Carpenter and individuals believed to be either supplying methamphetamine to her, or receiving it from her. The pen register also showed contacts with additional individuals that the DEA was attempting to identify. However, telephone number 417-300-3660 is a pre-paid phone which it appears that Carpenter has stopped using because it is no longer exhibiting any activity.

9

r.      On April 29, 2014, Amanda Robinson was arrested by the Branson, Missouri Police Department on theft and drug charges. During a post-Miranda interview with Branson Detective Todd Mallow, Robinson provided drug related information about a female known to Robinson as "Mel," and provided telephone number 417-300-3660 for "Mel." Detective Mallow called Special Agent Hooten about the incident, and Special Agent Hooten recognized this telephone as currently being utilized by Melody Carpenter, a target of this investigation.

s.      Shortly after her arrest, Amanda Robinson was released from custody without charges being filed. On May 1, 2014, Amanda Robinson was interviewed by Special Agent Hooten and Detective Mallow. Special Agent Hooten showed Robinson a photograph of Carpenter, and Robinson positively identified the photograph of Carpenter as the subject she knows as "Mel." Robinson said she met Carpenter approximately one month ago through Joshua Lyons.

t.      Robinson said since meeting Carpenter, she has purchased one-quarter gram to one-half gram quantities of methamphetamine from Carpenter on numerous occasions. She said Carpenter frequently moves around, staying in hotels and the homes of friends. Robinson said she has seen Carpenter driving a silver Mercedes SUV and a small red Mercedes car, but did not know if Carpenter owned either of the vehicles.

u.      Robinson said Carpenter has recently been with a Hispanic male who Carpenter said was her boyfriend. Robinson has met the Hispanic male on two occasions, and the Hispanic male was introduced to Robinson as "Diego." Special Agent Hooten

showed Robinson a photograph of Nelson Olmeda, and Robinson positively identified the photograph of Olmeda as the subject she knows as "Diego."

     v.    Through conversations Robinson has had with Carpenter, Robinson believes Olmeda is from Texas, and believes Olmeda may be Carpenter's methamphetamine one source of supply. Robinson did not have a telephone number for Olmeda.

     w.    On April 30 through May 1, 2014, under the direction of the Drug Enforcement Administration, the CS arranged, via several contacts over 417-300-3660, to purchase two ounces of methamphetamine from Carpenter. Contact was conducted via unrecorded telephone calls, recorded telephone calls, text messages, and in person.

     x.    At approximately 7:37 p.m., the CS arrived at the Battlefield Inn in Springfield, Missouri and entered the room Carpenter was occupying. Upon entering the room, the CS met Carpenter and an unidentified white male in the room. Carpenter produced a plastic bag containing several smaller bags filled with methamphetamine. The CS estimated that the larger bags contained three to four ounces of methamphetamine. Carpenter removed one bag containing an ounce of methamphetamine and another bag containing a quarter ounce of methamphetamine and handed them to the CS. The CS inspected the methamphetamine and negotiated the price for the one and a quarter ounces of methamphetamine to be $1,505.00. The CS questioned Carpenter about not selling him/her two ounces of methamphetamine and Carpenter indicated the remaining methamphetamine was to be sold to other customers of hers.

y.     On Monday, May 18, 2014, a traffic enforcement stop was conducted on a vehicle driven by the CS with Carpenter traveling as a passenger.  The stop was arranged based on information provided by the CS that Carpenter had solicited him/her to travel to Harrisonville, Missouri in return for an undetermined amount of methamphetamine.  Law enforcement arranged for the CS to give Carpenter the requested ride.  Missouri State Highway Patrol officers then stopped the vehicle on Missouri Route 13 near the Polk/Greene County line.

z.     The CS, who was driving the vehicle, gave consent to search it.  Officers located a methamphetamine pipe in the front passenger floorboard where Carpenter was sitting.  Carpenter admitted that the pipe was hers and was placed under arrest. Carpenter was transported to Troop D Headquarters where a post-Miranda interview was conducted. During the interview, Carpenter admitted to having contraband on her person and voluntarily relinquished a cloth bag hidden in the front of her jeans.  Located in the bag were four (4) clear plastic baggies which contained a crystal substance, three (3) syringes with unknown liquid, eight (8) yellow tablets, two (2) green tablets, empty baggies, a metal spoon with residue, approximately $1,920.00, and a digital scale.  The crystal substance in the baggies field tested positive for methamphetamine.  Carpenter admitted that all of those items were hers, and the money in her possession was the proceeds from selling some of the methamphetamine.  She also admitted she was returning to Springfield, Missouri to distribute the rest of the methamphetamine in her possession.  Carpenter again agreed to assist law enforcement.

aa.     On June 8, 2014, Carpenter contacted Sergeant Danielle Heil and informed her Patrick Fernandez was at a Days Inn, in Springfield, Missouri, distributing methamphetamine.   Carpenter indicated that Fernandez was in possession of a large amount of methamphetamine and was being assisted by a subject known only to her as "Billy," later identified as William T. Martinez-Cruz.   A state search warrant was obtained based on the information provided by Carpenter and additional corroborating information.   Before the warrant was executed, Martinez-Cruz was traffic stopped leaving the Days Inn and a Days' Inn motel key was located in his right front pants pocket for room #327.   At approximately 11:00 p.m., the state search warrant was executed on room #327 of the Days Inn, and officers discovered 1.5 pounds of methamphetamine and drug paraphernalia.

bb.     On June 13, 2014, an individual named Patrick Fernandez was interviewed by the DEA at the Springfield, Missouri Resident Office.   Before initiating this interview, Task Force Officer Banasik advised Fernandez of his Constitutional Rights via Miranda. Fernandez claimed partial ownership of the methamphetamine located in the Days Inn motel room and identified the other owner as Martinez-Cruz.   Fernandez explained that he and Martinez-Cruz received the methamphetamine from a source in Kansas City, who was not their regular source of supply.   They returned from Kansas City and checked into the room at the Days Inn.   Fernandez stated he and Martinez-Cruz began distributing the methamphetamine from the room.   Fernandez stated he sold Carpenter one ounce of methamphetamine on Sunday, June 8, 2014, and Martinez-Cruz had sold Carpenter four ounces of methamphetamine.

cc.     Fernandez said that Carpenter was his main distributor, and that she was responsible for distributing the majority of methamphetamine Fernandez received. Fernandez also indicated that Carpenter had numerous other sources of supply. Fernandez provided information regarding Carpenter's connections to other sources of supply which were consistent with information known to law enforcement, including information about Carpenter connection to "Diego."

dd.     Fernandez said Carpenter had told him about being stranded in Texas, and Diego arranging for her to get a ride back to Springfield with a black male and a white female. While returning to Springfield, Carpenter stated she was robbed of the cocaine by Herbert in Halltown, Missouri. This incident was documented by the Missouri State Highway Patrol.

ee.     Fernandez continued and stated approximately two months ago Carpenter had arranged for Diego to transport two kilograms of methamphetamine to Springfield, Missouri for redistribution. After arriving in Springfield and during one delivery, Diego became suspicious of a vehicle behind him and threw a package of methamphetamine out the window near the intersection of I-44 and Glenstone Avenue. The next day Diego and Carpenter asked Fernandez to retrieve the package. Diego gave Fernandez directions to the package and Fernandez retrieved it. Fernandez stated the package contained eighteen ounces of methamphetamine and he was given an ounce of methamphetamine for retrieving it.

ff.     Fernandez provided telephone number 417-268-0828 as his contact number for Carpenter. Fernandez continued and stated he uses that telephone to conduct his methamphetamine transaction with her.

gg.     On July 14, 2014, Fernandez again met with the DEA to provide information. During the interview, Fernandez received a text message from Carpenter, via 417-268-0828, in which she appeared to be discussing narcotic related activity. A few minutes after receiving the text message, Fernandez received a telephone call from Carpenter, who was using telephone number 417-268-0828. The call, which was partially recorded, discussed obtaining methamphetamine in various amounts and payments that were owed.

hh.     On July 14, 2014, Special Agent Mark Hooten, Task Force Officers Dan Banasik and Wes Collins met with Jonathan Heredia, a defendant in a separate investigation who has provided reliable and proven information in the past. Heredia stated several days ago he was with Renota Ann Garver when she received a telephone call from Nelson Olmeda. Garver placed the call on speaker, where Heredia was able to overhear. Heredia stated Olmeda was recruiting Garver to drive to St. Louis, Missouri, in a week to pick him up at the bus station. Olmeda indicated he would be transporting an unknown amount of methamphetamine back with him. Olmeda made statements which referred to Garver having done this before. From previous conversations Heredia has had with Garver, he believes Olmeda is from the Houston, Texas area. Heredia did not know the telephone number Olmeda was calling from.

ii.  On July 16, 2014, a Pen/Trap application and order authorizing T-Mobile Corporation, the service provider for cellular telephone number 417-268-0828, a telephone being utilized by Melody Carpenter, was signed by the Honorable David P. Rush, United States Magistrate for the Western District of Missouri.  On the same day the DEA St. Louis Technical Operations group arranged with T-Mobile Corporation for the installation of the Pen/Trap.  The Springfield, Missouri Resident Office began receiving Pen/Trap information the same day.

jj.  On July 18, 2014, Task Force Officer Wes Collins contacted Renota Ann Garver requesting drug related intelligence.  Garver stated a subject known only to Garver as "Diego," but later identified through a photograph as Nelson Olmeda, was soliciting her to travel to St. Louis, Missouri, to give him a ride back to Springfield, Missouri.  Garver indicated that Olmeda was a multi-pound methamphetamine distributor in Springfield, Missouri.  She stated that Olmeda was currently in Houston, Texas, meeting with his source of supply to arrange for the shipment of a multiple pounds of methamphetamine to Springfield, Missouri.  Olmeda intended to travel via commercial bus line to St. Louis, Missouri, when the arrangements were complete.  Garver did not know if Olmeda was going to travel with the methamphetamine or have it transported through a separate means.  Garver supplied two cellular telephones for Olmeda, 281-905-1739 (the Target Telephone) and 417-988-9296.  Garver stated Olmeda communicates on both telephones.

kk.  On July 19, 2014, Missouri State Highway Patrol Sergeant Danielle Heil received an unsolicited text message from Melody Carpenter, via cellular telephone number 417-268-0828.  The text message concerned Nelson Olmeda.  The text message

stated, in pertinent part, "Have u heard anything? Diego lost his driver, but they hsve the two kilos.I guess they r getting someone else to drive. They get paid 5 thousand. . . . Diego will be coming into town with I think Gordo or some other dude I guess jason, his best friend is the driver.they r coming in tomorrow or leaving tomorrow. .they r bringing two kilos, and some other stuff..im pretty sure ecstacy also." It is believed Carpenter is referring to Olmeda attempting to arrange the transportation of methamphetamine from the Houston, Texas to Springfield, Missouri.

ll.     A review of a court authorized Pen/Trap on Carpenter's telephone revealed, from July 16 through July 19, 2014, Carpenter has been in contact several times with the two cellular telephones attributed to Olmeda by Garver. Carpenter had contacted telephone number the Target Telephone (281-905-1739) eight times, the last date being July 18, 2014; and telephone number 417-988-9296, two times, the last date being July 19, 2014. Carpenter had earlier supplied law enforcement with the Target Telephone number, but has yet to supply law enforcement with the 417-988-9296 number.

mm.     Currently because of Carpenter's failure to comply with the Missouri State Highway Patrol's Cooperating Individual agreement her cooperation with law enforcement is unsolicited. Carpenter is very selective and vague when supplying information.

nn.     On July 21, 2014, Task Force Officers Wes Collins and Daniel P. Banasik met with Garver again concerning her knowledge of Olmeda's methamphetamine network. Garver stated she met Nelson Olmeda approximately six months ago through Wes Cantrell, who Garver described as a methamphetamine distributor for

17

Olmeda. Garver stated Olmeda has advised her on several occasions he receives kilograms quantities of methamphetamine from Houston, Texas. Garver can recall four trips Olmeda made to Houston, Texas, during the past six months. Garver stated Olmeda lives both in Springfield, Missouri, and Houston, Texas, but "really doesn't have" a residence in Springfield. Garver stated Olmeda stays with his brother Donatello "Pablo" Olmeda, Melody Carpenter, Wes Cantrell, or in motels while in Springfield. Garver stated Olmeda will be in Springfield months at a time. Garver also stated Olmeda primarily utilizes rental vehicles or receives rides from his distributors.

oo. Garver identified Olmeda's distributors as Melody Carpenter, Wes Cantrell, Jason Wolfe, Nick Luna, Kurt Jolander, Gary Butts, and Twila "Dawn" Vance. Garver also stated Olmeda is in the process of recruiting Dave Miller and Kyle Schutten as pound distributors.

pp. Garver showed officers text messages she had received from Olmeda, confirming some of the intelligence Garver provided. A series of text messages dated Friday, June 27, 2014, from Olmeda, utilizing telephone number 417-988-9296, is as follows: Olemeda: "Hey baby girl." Garver: "Hey did u make it." Olemeda: "Yes im In the H baby," "I need kyle to call Me babe." Garver stated in this series of text messages Olmeda advised her he had made it to Houston, Texas, and wanted Kyle Schutten to call him. Garver believed Olmeda needed to discuss drug related matters with Schutten.

qq. In another series of text messages dated Saturday, June 28, 2014, Olmeda texted Garver, again utilizing telephone number 417-988-9296, and stated, "I need to talk

to kyle so i can put him on work." Garver stated work means methamphetamine or distributing methamphetamine.

rr.     During a series of text messages utilizing telephone number 281-905-1739, dated Saturday, May 31, 2014, Olmeda texted Garver, "Just bc i dnt give you no work learn how to pay then maybe we can do something." Garver stated she was attempting to obtain some methamphetamine from Olmeda, but there was a dispute concerning payment of a previous drug transaction. Garver again stated "work" refers to methamphetamine.

ss.     On Friday, July 18, 2014, Garver texted Olmeda over the Target Telephone and asked for Olmeda's other telephone number. Garver texted, "Wats your other numb babe." Olmeda responded, "4179889296."

tt.     On July 21, 2014, Garver placed a recorded telephone call to Olmeda, via telephone number 417-988-9296. During the call, Garver asked Olmeda about his distribution activities in regard to David Miller. Garver asked, "Are you going to help him [Miller] this time or what?" Olmeda responded, "Yeah, I am." Garver then questioned Olmeda on what she should tell Miller and when Olmeda planned to return to Springfield. Olmeda responded, "Tell him he will have to wait." Olmeda also stated, "Uh, just tell him sometime, sometime by this week." According to Garver, this conversation concerned when Olmeda would be arriving with more methamphetamine.

uu.     When contacted Garver stated on July 23, 2014, at approximately 2336 hours, Garver received a telephone call from Olmeda, who at that time was utilizing the Target Telephone. During the conversation, Olmeda indicated he was not in Springfield, Missouri, and wanted to talk to Jason Wolfe. Garver stated they also discussed Kurtis

Jolander and Nick Luna. Garver stated Olmeda, who she identified in the text message as "D" for "Diego," stated it would be several days before his returned but the methamphetamine he possessed was blue in color, was high quality, and Nick Luna was in charge of the distribution aspect. Garver then advised she had seen Jolander last night and Jolander stated he was waiting for Olmeda's return so he could obtain methamphetamine.

10. Based upon the above facts, and pursuant to 18 U.S.C. §§ 3127, 2703(c)(1)(B), 2703(c)(2), and 2703(d), because there are reasonable grounds to believe such information is relevant and material to an ongoing criminal investigation, Applicant requests Sprint Corporation, and any other person or entity providing wire or electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information: (A) name; (B) address; (C) the billing names and addresses (if different); and (D) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address of a subscriber, for published, non-published, or unlisted dialing, routing, addressing, or signaling information captured by the pen register on the Target Telephone, and for published, non-published, or unlisted dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the Target Telephone as captured by the trap and trace device on the Target Telephone, upon oral or written demand by agents of the DEA.

11. In accordance with Title 18 U.S.C. § 3121(c), Applicant has informed the DEA it shall use technology reasonably available to it to restrict the recording or decoding of electronic or other impulses to the dialing, routing, addressing and signaling information utilized in the

20

processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communication.

12. Because the assistance of Sprint Corporation will be necessary to accomplish the objectives of the requested order, Applicant further requests the order direct Sprint Corporation to furnish information, facilities, and technical assistance necessary to accomplish the installation of the Pen/Trap, including installation and operation of the devices unobtrusively and with a minimum of disruption of normal service. Sprint Corporation shall be compensated by DEA for reasonable expenses incurred in providing such facilities and assistance in furtherance of the order.

13. It is further requested this Court's order apply to any changed cellular telephone number subsequently assigned to an instrument bearing the same cellular device as the Target Telephone, or any changed cellular device subsequently assigned to the same telephone number as the Target Telephone, or any additional changed telephone number(s) and/or cellular device(s), whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the Target Telephone within the 60-day period authorized by this order.

14. Applicant further requests the Court direct the local, long distance, and wireless carriers listed in the order, and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate the execution of the order, to notify special agents of the DEA, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the Target Telephone, to include telephone numbers and subscriber information (published and non-published) associated with these service changes.

15.     Applicant further requests, pursuant to 18 U.S.C. § 3123(d), the Court direct the local, long distance and wireless carriers listed in the proposed order, and any other local, long distance or wireless carrier that is obligated by the order to provide assistance to the DEA not to disclose in any manner, directly or indirectly, by any action or inaction, to the listed subscriber(s) for the Target Telephone, the subscriber of the incoming calls to or outgoing calls from the Target Telephone, the occupant(s) of said premises, or to any other person, the existence of the Application, the resulting court order, in full or redacted form, or the investigation for any reason, except as required to execute the order, unless or until ordered by this Court. Applicant further requests the order direct Sprint Corporation to take all necessary steps to provide access to enhanced caller identification to the DEA and to take all steps necessary to ensure the addition of enhanced caller identification is not reflected on the customer's bill or otherwise disclosed to the customer.

WHEREFORE, IT IS REQUESTED this Court enter an ex parte order for a period of sixty (60) days, commencing upon the date of installation of the Pen/Trap, authorizing the installation and use of a Pen/Trap to collect the dialing, routing, addressing, and signaling information (including date and time) associated with communications to and/or from the Target Telephone.

IT IS FURTHER REQUESTED the order authorize agents of the DEA to acquire, during the same 60-day period, subscriber information for the numbers captured by the pen register and trap and trace.

IT IS FURTHER REQUESTED the order direct the Sprint Corporation to furnish the DEA forthwith all information, facilities and technical assistance necessary to effectuate the order

22

unobtrusively and with minimum interference to the services presently accorded the user of the Target Telephone.

IT IS FURTHER REQUESTED this Application and the anticipated order of this Court be filed under seal, and the Court direct Sprint Corporation not to disclose to any person the existence of this Application, the resulting order, or the investigation for any reason, except as required to execute the order, unless or until ordered otherwise by this Court.

I declare the foregoing is true and correct to the best of my belief and knowledge.

Executed on August __8th__, 2014.

Respectfully submitted,

Tammy Dickinson
United States Attorney

By

Gary Milligan
Assistant United States Attorney

United States Attorney's Office
901 St. Louis Street, Suite 500
Springfield, Missouri 65806
Telephone: (417) 831-4406

Sworn to before me and subscribed in my presence at Springfield, Missouri, this 8th day of August, 2014.

HONORABLE DAVID P. RUSH
United States Magistrate Judge
Western District of Missouri

24